47 So.2d 455

## BIRMINGHAM ELECTRIC CO. v. ALABAMA PUBLIC SERVICE COMMISSION.

### 3 Div. 514.

Supreme Court of Alabama.

Oct. 20, 1949.

Rehearing Granted Feb. 2, 1950.

Further Rehearing Denied March 30, 1950.

Rehearing Denied June 30, 1950.

See also ante, p. 119, 47 So.2d 449.

W. B. White, S. M. Bronaugh, and White, Bradley, Arant & All, of Birmingham, for appellant.

A. A. Carmichael, Atty. Gen., and Mac-Donald Gallion, Asst. Atty. Gen., for appellee.

LIVINGSTON, Justice.

The appellant, Birmingham Electric Company, hereinafter called the "company", is a corporation existing under the laws of the State of Alabama and is engaged in business as a public utility rendering electric, transportation and steam heating service to the public in the Birmingham district. On March 16, 1948, the company filed with the Alabama Public Service Commission, hereinafter called the "commission", a petition under and by virtue of section 53, Title

48, Code, filing revised schedule of rates for its public transportation system and requesting that the same be made effective at the earliest possible date.

On March 19, 1948, the commission issued an order of investigation suspending the rates proposed until June 12, 1948, unless otherwise ordered by the commission. Pursuant to this order, the commission heard the matter in Birmingham on April 1, 1948, and on April 30, 1948, issued its order that the schedule of fares filed by the company should not become effective and that the then existing fares should remain in effect until otherwise ordered by the commission. The company thereupon perfected an appeal to the Circuit Court of Montgomery County and after hearing that court affirmed the commission's action. Prior thereto, on July 14, 1948, pursuant to application by the company, the judge of the circuit court granted the application for supersedeas and approved the bond filed by the company in connection therewith.

This appeal is from the judgment of the circuit court affirming the order of the commission.

The company's operations cover three fields, i. e., electric service, steam heat service and transportation service. The increase in rates sought in this proceeding is in transportation fares only. But the company presented its case based on the over-all picture of all three of its operations and asked that the commission make its determination on that basis as to whether or not the transit fare increase should be allowed or denied. The basic increase in transportation fares sought is from a seven cents cash fare to a ten cents cash fare with attendant varying scale for books of tickets, school tickets, etc.

The company and its predecessor companies have furnished Birmingham and the surrounding territory with transportation service since 1884. In 1903 use of electric street cars over the entire system was completed and the electric street railway system was thereafter extended from time to time as the communities served grew. From 1936 through 1940, following studies of modernization of the transportation system, gasoline bus service was substituted for electric street car service on thirteen lines and a program to modernize the system with gasoline buses, trolley coaches, and, on the long haul lines, high speed, modern and quiet street cars, was developed by the company but this program was interrupted by the war.

Mr. C. S. Thorn, president of the company, stated:

"Following the end of hostilities studies which had been carried on during the war years were completed and a fresh start was made on the continuation of the modernization program. Orders were placed for transit equipment—trolley coaches, motor coaches, and PCC cars. In 1945 a new transit franchise was negotiated with the cities served looking toward the completion of the program. Use of the transit service continued to increase as the Birmingham district further expanded and industry diversified. To meet this continued increase additional transit vehicles were ordered. Material progress was made on this program by the end of 1947, and it was expected that the entire program would be completed by the end of 1948 at a cost in excess of $6,000,000 for equipment and facilities. Completion of the program as outlined is dependent upon the company's ability to finance it. In the meantime the cost of all items entering into our operation has gone up; wage rates have increased just as have all other wage rates in the district and materials and supplies needed in the operation have also greatly increased in cost.

"Adequate over all revenues to meet all expenses, including the capital cost of the business are necessary. For, without such adequate revenues it will be extremely difficult, if not impossible, to obtain the needed money for expansion of the system to meet the demands of its customers. To enable the company to furnish the kind of transportation service which the public wants and is entitled to, it is imperative that the proposed transit fare schedule be made effective by April 15, as requested."

"If the company does not move forward with the modernization program it risks desertion of use of its system by passengers who will find other means of trans-

portation to do what they have to do and will go to private passenger automobiles or otherwise.

"The program, in any event, contemplates continuance of electric street railway operation for many years with high speed, quiet P. C. C. cars on the long haul lines."

At the time of the hearing before the commission it was estimated that over $2,010,000 remaining cash expenditure would be necessary for that part of the program to be completed in 1948, a substantial part of which must be raised by financing. Cancellation of the company's outstanding orders for the equipment necessary for such modernization would mean that the company "would not be able to finish the transit modernization program on the remaining lines that are due for modernization." The company "would not be able to make the substitutions" of trolley coaches, motor coaches and P. C. C. cars for old style equipment to be replaced in the modernization program, according to witness N. H. Hawkins, vice-president of the company.

Sections 52, 53 and 54, Title 48, Code of 1940, provide:

Section 52. "The rates and charges for the services rendered and required shall be reasonable and just to both the utility and the public. Every utility shall be entitled to such just and reasonable rates as will enable it at all times to fully perform its duties to the public and will, under honest, efficient and economical management, earn a fair net return on the reasonable value of its property devoted to the public service. In any determination of the commission as to what constitutes such a fair return, the commission shall give due consideration, among other things, to the requirements of the business with respect to the utility under consideration, and the necessity, under honest, efficient and economical management of such utility, of enlarging plants, facilities and equipment of the utility under consideration, in order to provide that portion of the public served thereby with adequate service."

Section 53. "Whenever a utility desires to put in operation a new rate or service regulation or to change any exist-ing rate or service regulation, it shall file with the commission a new schedule embodying the same, not less than thirty days prior to the time it desires to make the same effective; but the commission may, upon application of the utility, prescribe a less time within which the same may be made effective. In the absence of suspension or disapproval by the commission, as herein provided, the new rate or service regulation, embodied in any such new schedule shall become effective at the time specified in such schedule, subject however to the power of the commission at any time thereafter to take any action respecting the same authorized by this title."

Section 54. "To enable it to make such investigation, as, in its opinion, the public interest requires, the commission, in its discretion, for a period not exceeding sixty days may suspend the operation of any new schedule of rates or service regulations filed with the commission. Unless as a result of its investigation, the commission otherwise orders before the termination of such period of sixty days, such rate or service regulation shall thereupon become effective. The commission may make any order in the premises which it is authorized by any of the provisions of this title to make in any investigation or complaint, or on its own motion without complaint. Under this section the commission may act with respect to rates and service regulations of any utility prior to a valuation of the property of the utility affected."

As we have already said, the company based the petition for increased rates in transit fares on the over-all picture of all three of its operations, i. e., electric service, steam heat service and transportation service. The propriety of such a consideration was not raised, and the commission made its order on that basis. We will so review it and in doing so lay to one side the question of whether the facts, not fully developed, justify such consideration.

We also note that this is not a valuation proceeding under section 319, Title 48, Code. The legislative intent, as expressed in section 54, supra, is that the

commission may act with respect to rates and service regulations of any utility prior to a valuation, as contemplated by section 319, supra, of the property of the utility affected. But this does not mean that the mandatory provision of section 52, supra, to the effect that the utility is entitled to such just and reasonable rates as will enable it at all times to fully perform its duties to the public and will, under honest, efficient and economical management, earn a fair net return *on the reasonable value of its property devoted to the public service,* is meaningless and to be ignored in the application of the provisions of sections 53 and 54, supra.

This is not a case for the establishing of rates in the first instance, nor is it a case invoking the provisions of section 57 et seq., Code, under which a utility may file its complaint with the commission for the purpose of determining whether it is entitled to an increase of rates and, if so, the amount of the increase. Here, under the provisions of sections 53 and 54, supra, the company itself attempts to set up or designate the increased rate which becomes effective unless suspended by the commission. Under section 54, supra, the commission may suspend the new rate and make such investigation as in its opinion the public interest requires. The question of the burden of proof in such an investigation becomes material.

Section 71, Title 48, Code, provides: "All rates, fares, charges, classifications, and joint rates and orders establishing rules, regulations, practices, or services fixed by the commission shall be in force and shall be deemed prima facie reasonable and valid in any court wherein is properly drawn in question the reasonableness or validity thereof, and the burden shall be upon the party attacking said rates or orders to show that same are invalid or unfair and unreasonable."

■ Clear enough, the burden of proof in a proceeding under sections 57 et seq., supra, is on the utility. In an investigation under the provisions of section 54, supra, the burden is also on the utility. In effect, the attack on the existing rate is by the utility. The fact that the util-

ity itself sets up the increased rate instead of asking the commission to determine what constitutes a proper increase, can make no material difference. We think this construction accords with the legislative intent.

■ Much has been written on the question of what constitutes just and reasonable rates. We shall make no attempt to analyze all the authorities dealing with the subject. The question cannot be determined with mathematical precision or the use of any set formula or formulae. It must be determined in the exercise of a fair, enlightened and independent judgment in the light of all the relevant facts. It must be just and reasonable to both the investors' interest and the consumers' interest.

■ The rate of return must be equal to that generally being earned by others in the same general locality in business undertakings attended by corresponding risks and uncertainties. It must be sufficient to assure the investors' confidence in the financial soundness of the enterprise and enough to maintain and support its credit, so that the utility will be able to raise the necessary capital to improve and expand its service in the discharge of its public duties. All of this presupposes efficient, economical and honest management. Bluefield Water Works & Improvement Co. v. Public Service Comm., 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176; Los Angeles Gas Co. v. Railroad Comm., 289 U.S. 287, 53 S.Ct. 637, 79 L.Ed. 1180; Federal Power Comm. v. Hope Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333; Federal Power Comm. v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037; Smith v. Illinois Bell Tel. & Tel. Co., 282 U.S. 133, 160, 51 S.Ct. 65, 75 L.Ed. 255, 269; West v. United Railway & Electric Co., 280 U.S. 234, 50 S.Ct. 123, 74 L.Ed. 390; City of Birmingham v. Southern Bell Tel. & Tel. Co., 234 Ala. 526, 176 So. 301.

What constitutes just and reasonable rates for a utility is a question of fact calling for the exercise of common sense, sound and just judgment, not bound by any hard and fast rule or set formula. The fixing of such rates is a legislative act.

The Supreme Court of the United States in Federal Power Comm. v. Natural Gas Pipeline Co., supra, said [315 U.S. 575, 62 S.Ct. 753]: "The requirements of 'just and reasonable' embrace among other factors two phases of the public interest: (1) the investor interest; (2) the consumer interest. The investor interest is adequately served if the utility is allowed the opportunity to earn the cost of the service. That cost has been defined by Mr. Justice Brandeis as follows: 'Cost includes, not only operating expenses, but also capital charges. Capital charges cover the allowance, by way of interest, for the use of the capital, whatever the nature of the security issued therefor, the allowance for risk incurred, and enough more to attract capital.' State of Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, supra, 262 U.S. page 291. 43 S.Ct. [544] page 547, 67 L.Ed. 981, 31 A.L.R. 807. Irrespective of what the return may be on 'fair value', if the rate permits the company to operate successfully and to attract capital all questions as to 'just and reasonable' are at an end so far as the investor interest is concerned. Various routes to that end may be worked out by the expert administrators charged with the duty of regulation. It is not the function of the courts to prescribe what formula should be used. The fact that one may be fair to investors does not mean that another would be unfair. The decision in each case must turn on considerations of justness and fairness which cannot be cast into a legalistic formula. The rate of return to be allowed in any given case calls for a highly expert judgment. That judgment has been entrusted to the Commission. There it should rest."

In St. Joseph Stockyards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 725, 80 L.Ed. 1033, it was said: "The fixing of rates is a legislative act. In determining the scope of judicial review of that act, there is a distinction between action within the sphere of legislative authority and action which transcends the limits of legislative power. Exercising its rate-making authority, the Legislature has a broad discretion. It may exercise that authority directly, or through the agency it creates or appoints to act for that purpose in accordance with appropriate standards. The court does not sit as a board of revision to substitute its judgment for that of the Legislature or its agents as to matters within the province of either. * * * When the Legislature itself acts within the broad field of legislative discretion, its determinations are conclusive. When the Legislature appoints an agent to act within that sphere of legislative authority, it may endow the agent with power to make findings of fact which are conclusive, provided the requirements of due process which are specially applicable to such an agency are met, as in according a fair hearing and acting upon evidence and not arbitrarily. * * * In such cases the judicial inquiry into the facts goes no further than to ascertain whether there is evidence to support the findings, and the question of the weight of the evidence in determining issues of fact lies with the legislative agency acting within its statutory authority."

Our own case of City of Birmingham v. Southern Bell Telephone and Telegraph Co., supra, cited with approval the St. Joseph Stockyards case, supra.

Appeals from orders of the commission to the circuit court and proceedings thereon are provided by sections 79 and 92, Title 48, and appeals from the circuit court to the Supreme Court by section 90, Title 48. These sections are as follows:

Section 79. "From any final action or order of the commission in the exercise of the jurisdiction, power, and authority conferred upon it by this title, an appeal therefrom shall lie to the circuit court of Montgomery County, sitting in equity except appeals under chapter three of this title, and thence to the supreme court of Alabama. All appeals shall be taken within thirty days from the date of such action or order and shall be granted as a matter of right and be deemed perfected by filing with public service commission a bond for security of cost of said appeal when the appellant is a utility or person, and by filing notice of an appeal when the appellant is the State of Alabama."

Section 92. "If said appeal be taken by the utility, security for the costs of the appeal shall be given as in cases of appeals from the circuit court in equity cases, and if a supersedeas bond had been given on appeal to the circuit court as hereinabove provided for, then pending said appeal to the supreme court by the utility, and pending an appeal thereto by the public service commission, if it should appeal, such bond shall continue in force and effect and all the conditions thereof shall be complied with, and no other supersedeas bond need be given by the utility."

Section 90. "Either party may appeal to the supreme court of Alabama from the judgment or decree of the lower court, the appeal to be taken within thirty days from the rendition of said judgment or decree, under the same rules and regulations as are or may be provided by law for appeals from said court, except as herein provided."

In the case of Alabama Great Southern R. Co. v. Alabama Public Service Commission, 210 Ala. 151, 97 So. 226, 227, it was said: "Presumptively, when the Commission makes an order within the purview of its statutory powers, such order will be deemed reasonable and just, and a court will not deny nor prevent its enforcement unless it clearly appears that it is unjust and unreasonable." —See, Alabama Public Service Comm. v. Western Union Telegraph Co., 208 Ala. 243, 94 So. 472; Alabama Public Service Comm. v. Mobile Gas Co., 213 Ala. 50, 104 So. 538, 41 A.L.R. 872; North Alabama Motor Express Co. v. Rookis, 244 Ala. 137, 12 So.2d 183; Alabama Public Service Comm. v. Crow, 247 Ala. 120, 22 So.2d 721.

This appeal is from the decree of the Circuit Court, in Equity, of Montgomery County. That court made no finding of facts, but held that the evidence was such as to support the commission's order or decision. In its order the commission stated:

"On hearing, the company presented evidence to show their transit operations were currently being conducted at a loss. Detailed figures of operating revenues and expenses were submitted for its transportation department but comparably comprehensive data relating to the electric and steam heat services were not presented in evidence by petitioner. Testimony was that in determining net operating revenues for its transportation service, the company made an estimated allocation to transportation operations of its property reserve requirement which reserve the company keeps as a total. Company witness testified such allocation was not on a proper basis. Evidence also was that depreciation reserves of the company were not being kept in accordance with the classification of accounts as prescribed by the commission. No reliable evidence was presented in respect to the value of petitioner's property. In evident support of its position that its operations should be dealt with on an over-all basis, that is that the total earnings from all services should be the measure of the financial success of the company, an estimate of the future earnings of the company as a whole was submitted showing the over-all net operating revenue that would accrue to the company after giving effect to economies from modernization of transportation service, now under way and about two-thirds completed, increased costs due to pensions and wage increases, and increased revenue due to authorized increase in steam heat rates for the coming season. In projecting such figures for its electric service operations, petitioner assumed that its earnings from this service would remain at about the same level as it was for the twelve month period ending February 29, 1948. However, the past annual reports of the company on file with the commission show net operating revenues from electric service to have made a substantial increase in the last three years as follows:

| Year | Amount |
| --- | --- |
| 1945 | $1,089,702 |
| 1946 | 1,601,141 |
| 1947 | 2,179,840 |

"Monthly reports on file with the commission show an increase in January 1948 monthly electric operating revenue, after deduction of operating expenses and taxes, but before depreciation, over January, 1947, of $54,568 while similar figures for February, 1948 over February, 1947 show an increase of $60,623.

"This not being a valuation case for rate-making purposes, the commission will examine the over-all earnings of the company with the view of ascertaining the earning requirements for debt capital and preferred stock, and the resulting net return for common stock and surplus.

"Petitioner's February 1948 report shows that as of February 29, 1948, the company had outstanding bonds and other evidence of long term debt, including notes payable, in the total amount of $12,950,000. The earning requirements to meet the interest payments and amortization of debt discount and expense of this debt capital, on an annual basis is $374,700. As of the same date, the company also had outstanding 64,000 shares of preferred stock, (par value $100.00 per share), which carries an accumulative return of $4.20 per share per annum. The earning requirement on this stock is $268,800 per annum. The total earning requirement for debt capital and preferred stock as of February 29, 1948 is $643,500 on an annual basis. The book stated value of common stock as of same date is $5,743,759 and surplus amounted to $1,294,839 giving a total common stock equity as reflected by the February 29, 1948, balance sheet of $7,038,598. The net operating revenue for the twelve month period ending February 29, 1948, amounted to $1,126,231. Testimony is that included in the expenses for this period is a pension fund requirement which the company inaugurated in August 1, 1947 and which currently amounts, on an annual basis, to about $255,756. Testimony further shows that one of the chief reasons for drop in petitioner's earnings was transportation wage increases. However, such wages embodied in the contract will remain at their present level until March 27, 1949. Commencing with the last quarter of the year 1946, the company paid its holders of common stock a dividend at an annual rate of about 11.4% of the stated value of its common stock. This very substantial rate of dividend was paid during the entire year of 1947 and for the first quarter of 1948.

"The commission has reviewed and studied the evidence and record of this case and because of the company's posi- tion, as stated by its president, the commission has given particular consideration to the over-all picture of the company's earnings as revealed by the record and pertinent data made a part thereof. Witness for the company testified, in effect, that rates cannot be changed with every little change in economic conditions, but that over a period of years earnings should produce a fair return.

"Insofar as earning requirements are concerned, the company has estimated that if it receives its petitioned for rate increase for transportation, even assuming as did petitioner, that the level of earnings from its electric service would simply remain the same as it was for the twelve month period ending February 29, 1948, its net operating revenues, that is, the amount available for the payment of interest on debt capital, dividends on preferred stock and earnings from common stock and surplus, would total $1,779,014 on an annual basis. After deducting $643,500, which is the amount required for interest on debt capital and dividends on preferred stock, there would remain a balance of $1,135,514, for earnings on common stock which is equivalent to approximately 20% on the stated book value of the stock in question and about 16% of common stock and surplus. This amount the commission believes is highly excessive and exorbitant.

"Petitioner's February 1948 monthly report shows, for the twelve month period ending February 29, 1948, a net amount available for common stock and surplus of $562,270. This is over 8% of the common stock and surplus as shown by the February 29, 1948 balance sheet. Giving consideration to this, together with the fact that, (1) petitioner's net earnings from its electric operations have been for the past several years, and are presently, showing a steady increase averaging over $500,000 per year, (2) that its steam heat revenue will be increased close to $93,000 per year due to the recent rate increase to be effective for the coming heating season, and (3) that completion of its plan for modernization of its transportation system will effect over $350,000 annual additional operating economies, the commission is not convinced of the

present necessity of any increase in petitioner's over-all revenue.

"With respect to the company's dividend practice, this commission does not question the right of the company to pay reasonable dividends to holders of its common stock as this is a matter of management policy of the company. However, it is definitely the opinion of this commission there is certainly no justification for rate increases when the management of the company feels it has the ability to declare the high rate of dividend it is currently paying."

Section 82, Title 48, Code, provides: "The commission's order shall be taken as prima facie just and reasonable. No new or additional evidence may be introduced in the circuit court except as to fraud or misconduct of some person engaged in the administration of this title and affecting the order, ruling or award appealed from, but the court shall otherwise hear the case upon the certified record and shall set aside the order if the court finds that: the commission erred to the prejudice of appellant's substantial rights in its application of the law; or, the order, decision or award was procured by fraud or was based upon a finding of facts contrary to the substantial weight of the evidence. Provided, however, the court may, instead of setting aside the order, remand the case to the commission for further proceedings in conformity with the direction of the court. The court may, in advance of judgment and upon a sufficient showing, remand the cause to the commission for the purpose of taking additional testimony or other proceedings."

The company strenuously contends that (1) the commission erred in its application of the law and (2) that its order was based upon a finding of facts contrary to the substantial weight of the evidence and is unreasonable and unjust.

The evidence submitted to the commission is voluminous—the record containing more than one thousand pages. However, most of the evidence consists of exhibits depending upon the books of the company, annual and monthly statements made to the commission as required by law or the rules of the commission, copies of books of accounts of all description, financial statements and the like. We of course make no attempt to analyze it in detail.

The company takes the position that the rate base as fixed by section 52, supra, is the reasonable value of the utilities property devoted to the public service. There can be no doubt that this is true. It further contends that the books of a public utility are prima facie evidence of the matters therein contained. They will be assumed to be correct in the absence of evidence to the contrary. In support, the company cites Newton v. Consolidated Gas. Co., 258 U.S. 165, 42 S.Ct. 264, 66 L.Ed. 538; West Ohio Gas Co. v. Public Utilities Comm., 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761; Consolidated Gas Co. v. Newton, D.C.N.Y., 267 F. 231, 242; Kings County Lighting Co. v. Nixon, D.C.N.Y., 268 F. 143, 146; Mobile Gas Co. v. Patterson, D.C.Ala., 293 F. 208; Southwestern Bell Tel. Co. v. City of San Antonio, 5 Cir., 75 F.2d 880; Re Rates Missouri Southern R., (Mo.), P.U.R.1916C, 607, 618; Edwards v. Glen Telephone Co., (N.Y.), P.U.R.1916B, 940, 951.

Judge Learned Hand in the case of Consolidated Gas Co. v. Newton, supra, said [267 F. 242]:

"Most of the evidence and testimony in the case at bar necessarily depended upon the records of the plaintiff contained in books of account of all descriptions, supported by vouchers, books of original and secondary entry. These were proved only to the extent of showing their general character and that they had been kept in the usual course of the company's business. The same applied also to the Astoria books; that company being treated as though it were an operating unit of the plaintiff. Indeed, these books the defendant themselves offered in evidence.

"The defendants objected to the reception of all other books on the ground that they were not properly proved. Probably the proof was inadequate, even under the present-day laxer rules, had they been used in an ordinary case, as for example, to prove transactions recorded in them on which obligations of a third person depended. The case is not such. This is a suit between the authorities of a state and

a company long since recognized as performing a public service and under the regulation of the state. Article 4 of the Public Service Commissions Law of New York puts the entire conduct of such companies as the plaintiff minutely within the regulation of the Public Service Commission. Section 66 gives the commission general supervision over all such, power to investigate the quality of their services and to fix its character, to prescribe the form of the records and books it shall keep, to examine its officers and those records, to keep informed as to its doings and its property, to require a detailed annual report, including its receipts and expenses, and any other important facts it may wish, to enter upon its property and examine its books and vouchers, to compel the production of any such, to subpoena its officers, and to compel it to keep its accounts of separate businesses separately.

"Books kept in accordance with orders lawfully promulgated by the commission under such powers are on a different footing, in a suit based upon the action of the state and against its officers, from even the same books, if attempted to be used elsewhere. They have a public character, derived from the supervision which can be and is exercised over them. *The authorities are not, of course, bound by them in any event;* but, prepared as they are, under their direct and constant supervision, they can scarcely be put in the category of the usual ex parte entries about whose admission the cases are concerned. The state, having had so much hand in their creation and such continuous power of examining them, should not be entitled to demand a verification first hand of every item by common-law proof, before they become prima facie competent. The guaranty of their truth is sufficiently established by the scrutiny to which they are always subject, and the penalties which follow upon a disregard of the commission's orders. Section 73. It would, indeed, be an incredible burden to require every item to be separately established, and even these defendants have not gone so far as that; but, if the books are not prima facie competent, they might call for such proof, nor can I reject them without putting the company upon their mercy." (Italics supplied.)

The authorities cited support the admissibility of books and records showing the book value of the company's property, but, as stated by Judge Hand, *"The authorities are not, of course, bound by them in any event."* Here, there was countervailing evidence. In fact the testimony of the company's witness Reynolds is to the effect that the book value of the transportation property does not purport to be the fair value of such property at the time of the hearing.

■ Also, it may be that not all of the property shown by the exhibits is devoted to the public service as contemplated by section 52, supra. Book value is therefore not conclusive on the question of the proper rate base.

The company argues that the statement made by the commission in its order that, "no reliable evidence was presented in respect to the value of petitioner's property," is erroneous. And further that the order shows on its face that the commission used the net return for common stock and surplus, or stated value of common stock equity, as a measuring rod in denying the increase in transit fares, which fails to comply with the requirements of section 52, supra, and is arbitrary, illegal and void.

■ Clear enough the commission may refuse the increase in rates for the lack of convincing proof as to the value of the rate base. Such refusal is not a misapplication of the law, nor does it necessarily indicate that the commission applied a different measuring rod from that required by section 52, supra. It simply based its order upon all of the relevant evidence before it.

Complaint is made that the commission's findings of facts are in some instances inaccurate and unsupported by the evidence. Instances are pointed out in brief of claimed mathematical miscalculations, inaccurate or misleading deductions drawn from the data furnished showing earnings, expenses, financial conditions, taxes, etc. We do not think a detailed discussion of all of those questions is necessary. The remaining question is whether the order of the

commission was based upon a finding of facts contrary to the substantial weight of the evidence. Section 82, supra.

The burden of proof in this case, as we have heretofore indicated, was on the company. A part of that burden was the establishing of the value of a proper rate base. This does not necessarily mean a valuation of the utilities property as contemplated by section 319, Title 48; but some evidence or data must be furnished clearly indicating the reasonable value of the company's property devoted to the public service. Book value of the company's property is not always the reasonable value of the company's property devoted to the public service. For it is not shown that all of the property constituting the book value was being used in the public service; nor was it shown that the books of the company were kept in accordance with the commission's rules and regulations for showing proper accounts for depreciation.

Although there may have been inaccuracies and miscalculations in the finding of facts by the commission, in the last analysis the company must make out a case for the increase in transit fares which the company itself has set forth in its revised schedule. On the record before us, and under the rules that obtain, we cannot say that the order of the commission denying the increase is based upon a finding of facts contrary to the substantial weight of the evidence.

Affirmed.

BROWN, FOSTER, LAWSON, SIMPSON and STAKELY, JJ., concur.

On Rehearing.

PER CURIAM.

■ Application for rehearing is granted. Judgment of affirmance is set aside. The judgment of the Montgomery Circuit Court, in Equity, is vacated and the cause is remanded to the Alabama Public Service Commission for further proceedings and for taking additional testimony as provided for by section 82, Title 48, Code of 1940.

Application for rehearing granted.

BROWN, FOSTER, LAWSON and STAKELY, JJ., concur.

LIVINGSTON and SIMPSON, JJ., dissent.

LIVINGSTON, Justice (dissenting).

The opinion prepared on submission is not to be understood as holding that, upon an investigation provided for by section 54, Title 48, Code, the commission *must grant or refuse* the increased rate designated in the new schedule filed by the utility company. The commission may, when justified by the evidence, grant an increase other than that designated in the new schedule filed by the utility and suspended by the order of the commission.

On rehearing much argument is devoted to the question of the rate base and the evidence in regard thereto. The following excerpts are taken from the testimony of appellant's witness Mr. Reynolds:

"President Persons: Section 52 of the Act states this, that the rates and charges for the services rendered and required shall be reasonable and just to both the utility and the public. Every utility shall be entitled to such just and reasonable rates as will enable it at all times to fully perform its duties to the public and will under honest, efficient and economical management earn a fair net return on the reasonable value of its property devoted to public service. Now I will ask you this. What do you think is the reasonable value of the property devoted to the public service in the Transportation Division of the Birmingham Electric Company?

"The witness: The reasonable value of property is the fair value of the property.

"President Persons: All right, sir, now the fair value of the property among other things of course the base of it is the original cost, and then that property depreciates with age. The maintenance of that property of course, does not come into the picture, because that is an operating expense and chargeable directly to the rate payer or the rider as an operating expense. Now what do you consider the fair value of the prop-

erty of the Birmingham Electric Company devoted to its transportation system?

"The witness: Well, a fair value is a determination from various kinds of values that may have been placed on the property of what the property was worth.

"President Persons: What do you place that at?

"The witness: I have no value that I would place on it other than saying in placing any fair value, any values which had been placed on the property would have to be considered. For instance, in a case in 1934 the Alabama Public Service Commission, the commission engineer placed a value on the property, which was fair value, at December 31, 1930 of $32,000,000.

"President Persons: Of the transportation department?

"The witness: Of the property as a whole.

"President Persons: I am speaking of the Transportation Department.

Mr. White: Was that not separated in the commission's order, Mr. Reynolds?

"The witness: Yes, it was.

"Mr. White: Well look at it and give Mr. Persons the figure.

"The witness: This is Docket No. 6242 of the commission, decided January 30, 1932 and reads as follows: 'Included in such information, which is a part of the record, is an estimate of the commission's engineering department of the fair value of the utilities properties for rate making for the year 1930 as follows' and it shows the street railway as 17 million dollars.

"President Persons: What do you consider the fair value today?

"The witness: Mr. Persons, the fair value today would be to me the value of the property at the present time. *The value of the property at the present time has not been determined.* To determine the value of the property as of today you would have to take the price of construction indices and determine what that property that you put in 1940 or 1941 or some other year, would cost you today. In fact when we replace property today, maybe the same piece of property, we have to pay from 150 to 175 per cent of what that property might have originally cost. * * * (Italics ours.)

"Commissioner Owen: Do you know how much, do your figures there indicate how much actual cash the Birmingham Electric Company paid for its transportation properties from 1924 to 1947?

"The witness: I just gave you the amount that they spent in actual additions, gross additions at cost since 1924 by department. I don't have the total—yes, I do,—it is $12,-813,436, the gross addition.

"Commissioner Owen: And you started off with $9,069,000. Is that right?

"The witness: Yes, sir. And we retired $8,752,286, or added to the total property in the 25 years $4,051,150.

"President Persons: *But you don't know the fair value of your property for rate making purposes? You have no estimate on that?*

"The witness: *No, not what the fair value of it is today,* Mr. Persons. * * * (Italics ours.)

"Mr. Porter: May I ask him a question?

"President Persons: Yes, sir.

"Mr. Porter: Do you have a valuation of any figure that you expect to use to support the allegation in the petition that the rates requested are just and reasonable?

"The witness: Mr. Porter, we think in accordance with section 319 of the Code that all of the values should be considered in determining what is a fair value.

"Mr. Porter: I am asking do you have a value?

"The witness: Do I have a what?

"Mr. Porter: A valuation figure to support the allegation in your petition that the rate is just and reasonable, and if you do, what is it?

"The witness: We have several values, Mr. Porter.

"Mr. Porter: Will you state them?

"Mr. Bronaugh: This is getting a little ahead of us. We were going to put these figures in later on but it is all right to do it now.

"The witness: One value which might be considered is Perkins appraisal, original cost as of July 1st, 1922.

"The witness: At April 1st, 1924, the labor and material plus direct overheads such as engineering, but exclusive of any working capital, going value, cost of financing of superseded property is a figure of $18,117,910, for the over-all property—exclusive of gas I think I said.

"Mr. Porter: Is that the over-all transportation property?

"The witness: No sir, that is the over-all property of the company.

"Mr. Bronaugh: As of what date?

"The witness: As of April 1, 1924. Now the books as adjusted for these adjustments that I previously gave, and exclusive of gas as of April 1, 1924 is $18,309,776. The commission engineers fair value of December 31, 1930 under the docket which I previously gave you was 32 million dollars. The books as adjusted at December 31, 1930 were $26,916,491, or the commission's engineers fair value as of 12/31/30 in excess of books of $5,083,509. In the sale of the predecessor companys out of receivership in 1924, which was entered in the Federal Court, the value of the property was determined at these years the sales price at that time was an amount of some 29 million dollars, which was represented by the bid price for the BRL&P Company of $17,500,000, the Birmingham Tide Water of $750,000, making a total of—I can't find the figure.

"Mr. Porter: What is the last figure you are using?

"Mr. Bronaugh: The price in 1924.

"Mr. Porter: $29,000,000.

"The witness: Something like $29,000,-000, which was made up of the sales price of the BRL&P, $17,500,000 and Birmingham Tide Water of $750,000, or a total of $18,-250,000, plus net liabilities of over nine million dollars that we assumed, which gives a total of 29 million dollars.

"Mr. Porter: Can you break that down to the transportation system?

"The witness: No sir, I can't. It was sold as an overall property.

"Mr. White: The bidder did not bid for the street railway and electric, but bid for the whole property as you know.

"Mr. Porter: I understand, but we are trying to fix a rate, Mr. White, on the transportation system and it seems to me quite pertinent as to what the value of that property is, if you are going to take in consideration whether the rate is or is not reasonable, and if the witness has an opinion as to value I think he ought to tell. He has never answered the question.

"Mr. White: I am not so sure that Mr. Reynolds is qualified as an expert to testify on it.

"Mr. Porter: That is what I am trying to get at.

"Mr. White: Let us wait until we put a witness on who is qualified.

"President Persons: Who will the witness be?

"Mr. White: Well Mr. Thorn is as good an engineer as we have in the district, if you really want a figure, and I don't think Mr. Reynolds is an engineer. He doesn't buy the stuff.

"Mr. Bronaugh: Frankly, Mr. Persons, we had approached this thing from the standpoint of the over-all property. It is true that the transportation department is the thing that is giving us trouble right now, but the over-all picture has always been the way the thing has been treated, as an integrated utility."

The company produced no other witness who gave the information sought by the questions propounded to company's witness Reynolds; nor was like information furnished as to the over-all property of appellant.

Courts are not rate-making bodies. That is a legislative function which has been committed to the Public Service Commission in this State. Authorities, supra.

On an appeal the commission's order is taken as prima facie just and reasonable. Section 82, Title 48, Code. We are not convinced that the commission in entering the order appealed from erred to the prejudice of appellant's substantial rights in its application of the law or that the order

is contrary to the substantial weight of the evidence.

The majority of the Court is of the opinion that the rehearing should be granted, the judgment of the circuit court set aside and the cause remanded to the Alabama Public Service Commission for further proceedings and testimony. With this I cannot agree.

The appeal to this Court is under section 90, Title 48, Code, and not under section 79, Title 48, Code, which provides for an appeal from any final action or order of the commission to the circuit court, in equity, of Montgomery County. Section 82, supra, provides that the circuit court of Montgomery County may, *in advance of judgment* and upon a sufficient showing, remand the cause to the commission for the purpose of taking additional testimony or other proceeding. So far as this record discloses no such showing was made or attempted in advance of the judgment of the circuit court. I do not think that the judgment of the circuit court should be set aside and that court in effect put in error for a matter never brought to its attention nor acted on by it.

In my opinion, it was not the legislative intent that an appellant in the circuit court, nor in this Court, could speculate on a favorable decision of the court, on evidence submitted by it and, if unsuccessful, have the court remand the cause in order that it might supply evidence which it ought to have submitted before the commission.

Moreover, section 76, Title 48, Code of 1940, provides that: "At any time after an order has been made by the commission, any person interested therein may apply for a hearing in respect to any matter determined therein, and the commission shall grant and hold such rehearing within sixty days after the said application therefor has been filed, and such rehearing shall be subject to such rules as the commission may prescribe." Therefore, this proceeding does not preclude the utility from again presenting the matter of increase fares to the commission.

On this point I respectfully dissent.

SIMPSON, J., concurs.

On Second Rehearing.

PER CURIAM.

We take it that the appeal to the circuit court was under section 79, Title 48, Code. A supersedeas bond was executed by authority of section 81, Title 48, Code. The circuit court, in equity, heard and determined the cause on July 17, 1948, as authorized by section 82, Title 48, Code, and affirmed the order of the commission. Appeal was taken to this Court by the Birmingham Electric Company under authority of section 90, Title 48, Code. On the appeal to the circuit court, in equity, the cause was heard on the certified record before the commission. On appeal to this Court it is of course heard on the same record. On such hearing we affirmed the decree of the circuit court on October 20, 1949. An application for rehearing was granted by us on the second day of February 1950, and our judgment of affirmance was set aside and the judgment of the circuit court vacated and the cause remanded to the Alabama Public Service Commission for further proceeding and further testimony, as provided in section 82, Title 48, Code. An application for a rehearing by the Alabama Public Service Commission is now under consideration.

It is insisted on this application that section 82, Title 48, Code, does not apply to an appeal to this Court, but only to the proceedings on appeal to the circuit court. In answer to that, we observe that on appeal to this Court we are reviewing the decree of the circuit court. Section 82, supra, is a directive to the circuit court as to the nature and effect of its review. On appeal to us we determine whether the circuit court has properly determined the matters to which its power and duty extended under section 82, supra. So that our review is limited by the same provisions. Our opinion was to the effect in substance that the decree of the circuit court was not erroneous in holding that the Alabama Public Service Commission did not err to the prejudice of the company's substantial rights in its application of the law, or that the order of the public service commission was contrary to the

substantial weight of the evidence and, therefore, we affirmed the decree of the circuit court, without then considering the question of whether we should remand it to the commission in order that the deficiencies in the testimony may be supplied.

In its brief on application for a rehearing appellant requested us to remand it to the commission if we were still of the opinion that the judgment should not be reversed and rendered. We came to the conclusion that such a request should be granted and we so ordered. We fail to realize any difficulty or ambiguity in the order which subjects it to a claim that it is "unintelligible." We used the language of section 82, supra, which we verily believe is intelligible.

■ The effect of the argument for the commission on this application is that we are setting aside the decree of the circuit court without finding error in it. But we think that the error consisted in not itself making the remand to the commission. The decree was reviewable not only for what it did, but also for failing to do what we think it ought to have done. Section 90, Title 48, Code, provides that on appeal to this Court from such a decree the same rules and regulations shall apply as are provided by law for appeals (in other cases) from said court. Section 810, Title 7, Code, provides that on appeals from the circuit court to this Court, this Court may upon reversal of the decree remand the same for further proceedings or render such decree as the court below should have rendered when the record enables it to do so. We think the decree of the circuit court should have remanded the proceeding to the commission and, therefore, it was properly set aside, or reversed, and a decree here rendered such as the circuit court should have rendered, by remanding the cause to the commission.

It is also insisted that there was no assignment of error going to that defect in the decree. True, the assignments of error do not specify that the decree in equity was erroneous in not so remanding; but there is an assignment in general terms that it was erroneous.

■ The decree was a unit and not severable. If a decree of that sort is erroneous *in any respect* the error permeates the entire unit and an assignment in general terms is sufficient. Robinson v. Murphy, 69 Ala. 543, 546. This case distinguishes Alexander v. Rea, 50 Ala. 450, where the decree was subject to affirmance in some respect and reversal in others. We are not here dealing with a decree which is erroneous in part and correct in part. It was correct in approving the application of certain legal principles made by the commission and that its finding of facts was supported by the evidence, and there was not sufficient evidence of the sort needed to justify an order by the commission approving the proposed rate. But since we think that under those circumstances the decree in the circuit court should have remanded the proceeding to the commission, we therefore conclude that the decree was as a unit laid in error. So that the assignment of error covered that status.

It is our opinion that the legal effect of the order of this Court vacating the judgment of the circuit court and remanding the case to the commission was to vacate its order from which the appeal was taken to the circuit court and restore the status of the proceeding as it existed previous to the order of the commission.

Application for rehearing overruled.

BROWN, FOSTER, LAWSON and STAKELY, JJ., concur.

LIVINGSTON and SIMPSON, JJ., dissent.

#### On Further Rehearing.

FOSTER, LAWSON, and STAKELY,. Justices.

On October 20, 1949, the decree of the circuit court of Montgomery County, in equity, was affirmed.

Application for rehearing was granted on February 2, 1950. The judgment entered at that time is in pertinent part as follows:

"It is ordered on motion of the appellant that a rehearing be granted in this cause and that the decree of this Court rendered

on the 20th day of October, 1949, affirming the decree of the Circuit Court of Montgomery County, Alabama, In Equity, be set aside and vacated, Whereupon

"Come the parties by attorneys, and the record and matters therein assigned for errors, being argued and submitted and duly examined and understood by the Court,

"It is considered, ordered, adjudged and decreed by this Court that the judgment and decree of the Circuit Court of Montgomery County, Alabama, In Equity, be vacated and the cause remanded to the Alabama Public Service Commission for further proceedings and for taking additional testimony as provided for by Section 82, Title 48, Code of 1940."

Thereafter, on February 17, 1950, the Alabama Public Service Commission, the appellee, filed its application for rehearing. This application was denied on March 30, 1950. The judgment of this court under date of February 2, 1950, remained in effect.

Although the Commission's application for rehearing was overruled, the opinion of this court was extended so as to include the following language:

"It is our opinion that the legal effect of the order of this Court vacating the judgment of the circuit court and remanding the cause to the commission was to vacate its order from which the appeal was taken to the circuit court and restore the status of the proceeding as it existed previous to the order of the commission."

The rule is well established that during the term of this court in which a judgment is entered, we have the right to order a case placed on our rehearing docket for further consideration. Kinney et al. v. Pollak et al., 225 Ala. 229, 142 So. 390. After careful consideration, we think that the ends of justice would be served in so doing in this case, and it is now ordered. And upon such rehearing and further consideration, we are of the opinion that we should eliminate from our former opinion on second application for rehearing that feature of it which undertakes to give expression to the effect of our order remanding the cause to the Commission, and to say now that, in our opinion, the remandment ordered by authority of § 82, Title 48, Code 1940, is what it purports to be under the terms of that statute. That is to say, it becomes the duty of the Commission and it is directed to set the cause down for further proceedings and the taking of evidence as is available to the utility, and that the Commission, on the basis of such proceedings and evidence as shall be submitted, in connection with that previously taken, shall make a redetermination of the issues there made and determine whether the proposed rate, or what new rate, if any, shall be approved by the Commission, subject to further appeal as may be provided by law. Until such an order is made and the cause finally determined, or otherwise finally disposed of, it remains *in fieri*. Until that time the supersedeas order first made and the bond given in accordance with it remain in effect. This court and the circuit court having exercised the power and jurisdiction conferred by § 82, Title 48, supra, can make no further orders and decrees in the cause until it shall come up again by appeal as authorized by law.

Our former opinion is modified, as above indicated, and, as so modified, the rehearing is overruled.

LIVINGSTON and SIMPSON, JJ., concur in the conclusion that if the purported remand can be made under authority of said § 82, Title 48, Code, as the majority has so ruled, then the order of the Public Service Commission remains *in fieri* and the supersedeas bond remains in full force and effect (quoting the statute) "until final disposition of said cause", § 82; and the Public Service Commission should now proceed in line with the views of Justices FOSTER, LAWSON and STAKELY, hereinabove set out.

They do, however, reiterate their dissent to the view expressed in the majority opinion that there is a field here for the operation of said § 82. See original dissent, supra.

BROWN, J., does not agree with the foregoing for reasons stated specially by him in case ante, p. 123, 47 So.2d 449.