226 So.2d 320

**AUTO–OWNERS INSURANCE COMPANY,**
a Corporation

v.

**Mathew V. STOKES, III, a minor who sues by and through his father M. V. Stokes, Jr., et al.**

4 Div. 316.

Supreme Court of Alabama.

Aug. 7, 1969.

Rehearing Denied Sept. 18, 1969.

J. M. Albritton, Robert B. Albritton, Albrittons & Rankin, Andalusia, for appellant.

Tipler & Fuller, Andalusia, Holberg, Tully & Hodnette, Mobile, for appellees.

HARWOOD, Justice.

This is an appeal from a decree entered in a declaratory judgment action. The bill was filed by M. V. Stokes III, suing by his father and next friend M. V. Stokes, Jr. The respondents were Auto-Owners Insurance Company, and six individuals who had filed suits against M. V. Stokes III, claiming damages for injuries suffered in a collision between an automobile driven by M. V. Stokes III, and another automobile.

Paragraph 1 of the bill is in usual form for introduction of the parties.

Paragraphs 2 and 3 are as follows:

"2. That on or about the 3rd day of August, 1966, the Respondent, Auto-Owners Insurance Company, a corporation, under its policy of automobile liability insurance numbered 60011703067573 covered a 1960 Chevrolet automobile owned by M. V. Stokes, Jr., father of Complainant, for a period of three months, said policy being issued and delivered by Robert C. O'Neal, the duly authorized agent of Auto-Owners Insurance Company, a copy of said policy, together with a schedule of coverages, being hereto attached, marked 'Exhibit A' and made a part of this Bill of Complaint as completely as if set out in this paragraph in full.

"3. That the above mentioned policy of liability insurance afforded complainant insurance coverage as to bodily injury in the amount of $50,000.00 for each person; and $100,000.00 for each occurrence while driving the vehicles scheduled therein; and afforded insurance coverage as to property damage in the amount of $5,000.00 for each occurrence."

Paragraph 4 asserts that while driving the 1960 Chevrolet scheduled in the policy of insurance, complainant was involved in an automobile accident resulting in bodily injuries to the named individual respondents, and that one of the individual respondents, Samuel A. Minervino, suffered property damage.

Paragraphs 5, 6, 7, 8, 9, and 10, describe the suits filed by the individuals, who are respondents in this proceeding, against M. V. Stokes III, as a result of the automobile accident.

Paragraph 11 details the forwarding of the suit papers to Auto-Owners with a request that it defend the suits. The paragraph further avers that Auto-Owners acknowledged receipt of the suit papers but contended that the policy afforded coverage for only $10,000.00 damages for one person and $20,000.00 for each occurrence instead of $50,000.00 and $100,000.00 coverage.

That part of the prayer of the bill pertinent to this review is as follows:

"He prays that upon a final hearing of this cause Your Honor will render a declaratory judgment and decree construing the policy of insurance made 'Exhibit A' hereto and declaring the amount of coverage your complainant is afforded with respect to the accident of August 7, 1966, as far as bodily injury coverage is concerned.

"Complainant prays for general relief."

The respondent Auto-Owners filed a demurrer to the bill, and upon its being overruled, filed an answer. The remaining individual respondents also filed their answers. The cause then came on for hearing.

At the beginning af the hearing below the Chancellor announced that the case would be tried under the equity rule and no objections or exceptions would be necessary, and only legal evidence would be considered.

The material, relevant, competent, and legal evidence produced below tends to show that for some ten years M. V. Stokes, Jr., had procured his automobile insurance through the O'Neal Agency in Andalusia. This agency is an independent insurance agency representing some ten companies. The casualty coverage in these policies had been for $50,000.00 for each person and $100,000.00 for each occurrence as shown on the "Secedule of Coverages."

In early May of 1966, Mr. Stokes bought a 1960 Chevrolet Impala for the use of his sixteen year old son, M. V. Stokes, III. At this time he called Robert O'Neal of the O'Neal Agency, and requested that he insure the 1960 Impala. At this time as before stated, Mr. Stokes had in force an automobile insurance policy issued by Auto-Owners covering two other automobiles he owned. The casualty coverage on these two automobiles was $50,000.00 and $100,000.00. The expiration date of this policy was 3 August 1966.

Both Mr. Stokes and Mr. O'Neal testified that the amount of coverage for the Impala was not mentioned in this conversation.

On 11 May 1966, Mr. O'Neal forwarded to Auto-Owners a form "To add a car or change to a young Driver Class." This form disclosed that the automobile to be added to the policy was to be principally operated by M. V. Stokes III. The limits of the casualty coverage requested were designated "50/100."

On 18 May 1966, Auto-Owners wrote Mr. O'Neal:

"Acknowledging your Endorsement Request of May 11, to add a 1960 Chevrolet for the young driver at Class 2–1 rates.

"Our Company is not interested in writing the limit of liability of $50,000/$100,000 for this young driver since the vehicle will be used daily to go to and from school. We feel that the maximum limits we can write on this particular item is $10,000/$20,000 bodily injury and $5,000 property damage and are endorsing the policy accordingly.

"Your Agency will ·be receiving the Endorsement shortly and you should advise the Assured of the change in coverage."

O'Neal testified that after receiving the above letter, he went to Stokes' place of business and read him the letter and told him it was the intent of Auto-Owners to limit the coverage on "the boy" to "ten-twenty" and this was all they would write coverage for.

Shortly after this O'Neal received from Auto-Owners a schedule of coverage covering all three automobiles owned by Stokes. The date of this coverage was May 1, 1966. The casualty coverage on the two automobiles covered in the schedule of coverage remained unchanged, that is, such coverage was 50 and 100 thousand dollars. The coverage on the added Impala was "10/20."

This schedule is divided into columns with intersecting lines forming squares. At the top of each column are various legends. The first column on the left is under the legend "Car No." In the respective squares in this column the three automobiles owned by Mr. Stokes are listed separately, one in each square. About midway of the top of the schedule is a column designated "Bodily Injury—Limits unless otherwise specified." In this square appear the words "Each person," with the figure 50 typed immediately above, and beneath the words "Each occurrence," with 100 typed above. Also at the bottom of this square are the words "Thousands of Dollars." In the squares applicable to the two automobiles for which the policy was originally issued only the typed amount of the premium for the casualty insurance is shown.

In the square pertaining to the coverage on the 1960 Chevrolet (the automobile in-

volved in the accident) appear the typed figures "10/20," with the figures "51.60" immediately beneath.

Mr. O'Neal testified positively that upon receipt of the schedule of coverage adding the Impala, he personally delivered the same to Mr. Stokes.

Mr. Stokes testified to the effect that he knows no one read any letter to him pertaining to limiting the coverage on the Impala—and as to whether O'Neal told him of the limited coverage, Mr. Stokes testified:

"No, I can't swear he didn't come out and discuss with me * * * and I have given it a lot of thought."

Mr. Stokes testified to this effect several times, until he was placed on the stand for a third time by counsel for the individual respondents for further cross examination. He testified he had not seen the letter from Auto-Owners limiting the casualty coverage on the 1960 Impala until it was shown him during the course of the trial. On further examination by counsel for Auto-Owners, he again testified he was not saying O'Neal did not come out and tell him he could get only ten and twenty casualty coverage on the Impala but he was saying O'Neal did not read the letter from Auto-Owners to him, nor did he himself read the letter.

Mr. Stokes was again further examined by counsel for the individual respondents, and answered affirmatively a question as to whether he considered his recollection as good as O'Neal's The record then shows the following:

"Q. (Mr. Tipler continuing) Is it your recollection that Robert (O'Neal) told you you had only ten and twenty before that wreck or not?

"A. No, he did not."

Mr. O'Neal testified to the effect that he had formerly been associated with Mr. Stokes in the stockyard business, and is still a stockholder in the Stokes-Brogden Stockyards. He visited the Stokes-Brogden Stockyards once or twice a week. He personally delivered the policies and endorsements to Mr. Stokes, and so delivered the Schedule of Coverages. The jacket of the policy remains the same, and when a schedule of coverage is delivered it becomes a part of the policy by being placed therein.

The Impala was added to the policy by the Schedule of Coverages in May 1966. Mr. O'Neal testified that in July 1966 he renewed the policy sued on by obtaining from Auto-Owners a schedule of coverages for the period 3 August 1966 to 3 February 1967. This schedule was the same as that of May 1966, in that it showed a casualty coverage of fifty-one hundred thousands of dollars on the 1963 Chevrolet and the 1965 Ford, and "10/20" on the 1961 Chevrolet. As to the delivery of this document, O'Neal testified:

"Q. In your best judgment did you take the renewal on 8–3 of '66 out there?

"A. Prior to then, yes sir.

"A. Sometime in July?

"A. That's right, either July or the first part of August."

Mr. Stokes testified that he would not say the policy and schedules of coverages were not delivered to him as testified to by O'Neal, though he did not recall such deliveries.

He treated Mr. O'Neal as his agent and, "I'm not saying he didn't deliver this schedule of coverage to me in May." Mr. Stokes further testified he had never read one of his insurance policies in his life.

When asked if he had lost the policy sued on, Mr. Stokes replied:

"To be perfectly honest with you, I don't know whether I lost it or misplaced it. I don't look after my personal business as good as I do my company business."

After the hearing below, the Chancellor entered a decree which in parts pertinent to this review reads:

"The Court finds from the evidence that at the time of said accident, the Complainant was driving the automobile under such conditions as to be afforded coverage by the terms of the policy whatever the limits might be. Upon consideration of all of the evidence and the Law in this case, the Court is of the opinion that said policy of insurance afforded coverage to the complainant in the sum of $50,000.00 for one person and $100,000.00 for any one occurrence."

The court then entered a dicretal order consonant with the above findings.

Auto-Owners perfected its appeal from this decree.

In brief counsel for appellant states that the appellant is seeking a reversal of the decree on two theories, (1) the insufficiency of the complaint to withstand a demurrer to the effect that there was no equity in the bill, and (2) the insufficiency of legal evidence to support the decree.

■ A demurrer is rarely appropriate in a declaratory judgment proceeding. Curjel v. Ash, 261 Ala. 42, 72 So.2d 732. We think the bill, with Exhibit "A" made a part thereof, stated the substance of a bona fide justiciable issue which should be settled by a declaration of plaintiff's rights under the policy. Ellison v. Canal Insurance Co., 264 Ala. 24, 84 So.2d 642, and cases cited therein.

We hold the Chancellor did not err in overruling the demurrer filed to the complaint.

*Sufficiency of the Evidence to Support the Decree*

Counsel for appellant in brief under a number of propositions of law has grouped assignments of error 3 through 9, 11 through 15, 19 through 22, and 25 through 30, and has argued under these the legal sufficiency of the evidence to support the decree.

All of the above assignments, except assignments 25 through 35, assert in various ways that the court erred in entering its decree, that there was no legal, competent, and material evidence to support the decree, or that the decree is contrary to the legal, competent, and material evidence submitted.

Assignments 25 through 30, assert error because of the testimony of certain witnesses over the respondent's objection.

■ We quote the following principles set forth in the case of Hartford Fire Insurance Company v. Shapiro, 270 Ala. 149, 117 So.2d 348, which we think prima facie necessitates the conclusion that the Chancellor erred in the decree rendered. The statement of these principles cite supporting authority, which in the interest of brevity we omit.

"First, as regards the contract of insurance: It is familiar law that a contract of insurance is essentially like all other contracts, and governed by general rules of contract." (Citations omitted.)

"Where there exists between the parties a written contract, the authorities are in agreement that parol evidence cannot be received to explain, contradict, vary, add to, or subtract from its terms." (Citations omitted.) "The statement of this rule employed in insurance cases, is that all parol negotiations, understandings and agreements are merged into the written policy." (Citations omitted.)

\*   \*   \*   \*   \*   \*

"\* \* \* The majority of American courts hold that if the policy is accepted by the insured, he is bound thereby, even though the policy does not correspond to the preliminary negotiations." (Citations omitted.)

"This same rule would seem to obtain in Alabama, since our precedents provide that an insured is presumed to be familiar with the provisions of his policy."

The appellee made a part of his bill, as Exhibit A, the policy sued on. While the in the amount of $50,000.00 for each person, and $100,000.00 for each occurrence, the Schedule of Coverages of the policy was as before described.

■ Recitals in exhibits to a bill of complaint take precedence over the averments in the bill proper, and when the averments in the bill are not in accord with the exhibits, the facts disclosed in the exhibit will control. State of Alabama v. Mudd, 273 Ala. 579, 143 So.2d 171; Orso v. Cater, 268 Ala. 130, 105 So.2d 108.

Counsel for appellee Stokes has set forth a number of arguments seeking to uphold the decree rendered.

■ First, counsel argues that, "The change of coverage from $50,000.00 for each person and $100,000.00 for each occurrence as bound by O'Neal on May 11, 1966 to $10,000.00 for each person and $20,000.00 for each occurrence was never effectuated in accord with the requirements of the policy." Counsel cites Section 22 of the policy in support of his contention.

Section 22 of the policy provides:

"* * *; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part hereof, signed by an executive of the Company."

We note, however, that the opening statement of the policy recites:

"* * *, in consideration of the payment of premiums and the statements in the declarations made a part hereof and in the application and subject to all the terms of this policy, agrees * * *"

Counsel argues that the schedule of coverages by which the Impala was added to the policy was never endorsed by an executive and constituted a variance in the policy.

Certainly in the complaint and in the proceedings below the entire thrust of appellee's contentions were that the appellee was entitled to a liability coverage of 50 and 100 thousand dollars because these were the amounts of coverage for the two automobiles of Mr. Stokes' already covered by the policy. These figures, and the amounts of the premiums to be paid appear in the policy only in the schedule of coverages. Thus appellee throughout has based his claim on the schedule of coverages, which he now seeks to assert were never properly endorsed. In other words, the appellee throughout the proceedings below has treated the schedule of coverages as the Declarations referred to in the opening paragraph of the policy.

bill avers that the policy afforded coverage

■ A case will not be reviewed on a theory different from that on which it was tried below. Weston v. Weston, 269 Ala. 595, 114 So.2d 898; Smith v. Smith, 274 Ala. 641, 151 So.2d 234; Inter-Ocean Ins. Co. v. Banks, 268 Ala. 25, 104 So.2d 836.

Counsel for appellee next contends that the figures 10/20, with the figures 51.60 immediately underneath are ambiguous and insufficient to specify any change of coverage from that denoted for the two automobiles originally insured—that is, liability coverage of 50 and 100 thousand dollars. Counsel argues that the figures could mean that $51.60 was due on October 20, or that an additional premium of $10.20 was due; that while "10/20" might mean liability coverage of ten and twenty thousand dollars to a lawyer or an insurance agent, the figures must be interpreted according to what they might indicate to a layman.

Counsel's argument relates merely to the figures taken completely out of context. Since they appear in the square related to the Impala, and to the coverage, it is certainly arguable that a layman would have no difficulty in determining that the liability coverage on the Impala was $10,000.00

per person and $20,000.00 for each occurrence.

But regardless, we can only conclude from the record that the meaning of the figures was not ambiguous to Mr. Stokes. The testimony of Mr. Stokes was directed toward showing that at all times, even for several days after the wreck, he understood he had casualty coverage for 50 and 100 thousand dollars on the Impala, "because this was the coverage on his two automobiles already covered by the policy."

Upon being shown a copy of the Schedule of Coverages for the policy period 3 February 1966 through 3 August 1966, which was identical as to coverage in the Schedule of Coverages accompanying the policy made an exhibit to the bill of complaint, except for the period covered, Mr. Stokes was asked by counsel for the appellant:

"Q. (Mr. Albritton continuing) I will ask you to look at this exhibit, take it and look at it. (Handed to witness) Do you recall seeing that before?

"A. No. If I had recalled I would have known I didn't have that coverage."

Counsel for appellee next contends that because O'Neal forwarded to Auto-Owners on 11 May 1966, a paper which the record shows clearly was a request to add the Impala, to be driven by a young driver, to the Schedule of Coverages, the company was thereby bound by the fifty-one hundred thousand casualty coverage requested for the Impala by O'Neal since appellee was never notified of the reduced limitations in the schedule of coverages demanded by the company.

Mr. O'Neal testified unequivocally that he had personally delivered the policy and the two schedules of coverages to Mr. Stokes, and further had told Mr. Stokes that Auto-Owners would undertake casualty insurance on "the boy's car" (the Impala) only to the extent of 10 and 20 thousand

dollars. While Mr. Stokes in one part of his testimony denied that O'Neal had informed him of the reduced limitations on the casualty coverage, he did not contradict O'Neal's testimony as to the delivery of the policy and the schedule of coverages, merely stating he would not say the policy and schedule of coverages were not delivered to him, though he had no recollection of such deliveries.

In this regard the bill of complaint itself avers that the policy sued on covering a 1960 Chevrolet automobile, was issued and delivered on or about the 3rd day of August 1966.

The schedule of coverages adding the Impala to the Schedule of Coverages being accepted by Stokes, he is bound thereby, even though the terms do not correspond to what he "thought" or "assumed" the coverages would be. The tender of the schedule of coverages by Auto-Owners through O'Neal could mean nothing else than that Auto-Owners thereby undertook to extinguish its previous obligations (the binder) and present the schedule of coverages to Stokes as its sole obligation. Hartford Fire Ins. Co. v. Shapiro, supra.

At the opening of the argument portion of his brief counsel for appellee, after setting forth various groupings of appellant's assignments of error, has stated:

"Many of the assignments argued collectively are general in nature, * * * The appellant's assignments as argued are therefore subject to the rule that Assignments of Error argued collectively must each have independent merit to be considered on appeal. Walker County v. Burdeshaw, 169 So. 227, 232 Ala. 621; Bankers Life [Fire] and Marine Ins. Co. v. Draper, 18 So.2d 409, 245 Ala. 653; others cited at 2 A Ala.Dig., 585, Key No. 1079."

The rule as above stated is misleading in that when assignments are so

related as to present a single question, it is proper to group them for argument, and the rule that if *unrelated* assignments are argued in bulk, and one assignment is not well taken, review of the remaining assignments may be pretermitted, will not be invoked. Wells Co. v. Lane, 217 Ala. 10, 115 So. 77; White Dairy Co. v. Sims, 230 Ala. 561, 161 So. 812; Boohaker v. Trott, 274 Ala. 12, 145 So.2d 179.

█ Where a decree is a unit, and not severable, as in this case, and is erroneous in any respect, the error permeates the entire unit, and an assignment in general terms is sufficient. Robinson v. Murphy, 69 Ala. 543; Birmingham Electric Co. v. Alabama Public Service Commission, 254 Ala. 140, 47 So.2d 455.

Appellant has set forth several groups of assignments with reference to propositions of law under that portion of its brief wherein is argued, "a complete lack of legal evidence to support the decree." All of these groups of assignments are related and kindred, with the exception of the grouped assignments "25 through 30." The assignments in this group relate to certain specific instances of evidence introduced below. We presume such evidence was not considered by the Chancellor since in the instances referred to in the assignments the evidence was palpably inadmissible. However, counsel has made assignments "25 through 30" and argued the same by reference to the particular evidence of the witnesses, under the argument relating to the other groups of assignments which are kindred and related. Counsel for appellant is disturbed because the decree states it was rendered upon consideration of *all* the evidence, rather than on consideration of legal, competent, and relevant evidence. In this sense assignments "25 through 30" may be kindred to the remaining groups of assignments argued together which go to the sufficiency of the evidence to support the decree.

█ Counsel for appellant in brief have set out an adequate statement of the case, and the testimony of each witness in narrative form. The brief inherently and clearly shows the argument under the above grouped assignments is directed to the sufficiency of the evidence, and directed to certain inadmissible evidence under assignments "25 through 30." Opposing counsel does not seem to have been misled or troubled in replying to the arguments advanced, even though the brief does not specify the respective assignments to which the arguments are directed. Under such circumstances the court will exercise its discretion to give consideration to the assignments. Davis v. Wells, 265 Ala. 149, 90 So. 2d 256.

For other cases in which the court has exercised its discretion to consider assignments of error through the form of the brief does not altogether conform with the requirements and standards of Sup.Ct. Rule 9, or other rules. See Simmons v. Cochran, 252 Ala. 461, 41 So.2d 579; Schmale v. Bolte, 255 Ala. 115, 50 So.2d 262; Edge v. Bice, 263 Ala. 273, 82 So.2d 252; Shelby County v. Hatfield, 264 Ala. 488, 88 So.2d 842; Brooks v. Everett, 271 Ala. 380, 124 So.2d 100; Commercial Standard Ins. Co. v. New Amsterdam Cas. Co., 272 Ala. 357, 131 So.2d 182; Davis v. Wells, 265 Ala. 149, 90 So.2d 256; Stiles v. Lambert, 39 Ala. App. 15, 94 So.2d 784, affd. 266 Ala. 184, 94 So.2d 788.

Being clear to the conclusion that the decree was erroneously entered, we perforce must enter a judgment of reversal.

Accordingly, the decree is reversed, and remanded to the lower court with instructions to enter a decree consonant with this opinion.

Reversed and remanded with instructions.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.